UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | |
| | : | |
| | : | ss: Hartford, November 30, 2022 |
| | : | |
| COUNTY OF HARTFORD | : | |

# AFFIDAVIT

I, Christopher Kiely, currently assigned as a Task Force Officer with the Federal Bureau of Investigation, having been duly sworn, do hereby state:

## I. INTRODUCTION

1. I am a Task Force Officer with the Federal Bureau of Investigation ("FBI") and have been acting in such capacity since 2021. In conjunction with my assignment as a Task Force Officer ("TFO"), I am employed as a police officer by the City of New Britain Police Department ("NBPD") and have been so employed since 2009. In 2017, I was promoted to the rank of detective. In 2020, as a detective, I was assigned to the NBPD Special Services Unit ("SSU") which is a unit within the New Britain Police Department that engages in narcotics, gang and firearm investigations. My assignments have included investigations of drug and firearm trafficking, wanted person investigations/arrests, assault and crimes against persons, and gang related criminal activity.

2. As a detective with the New Britain Police Department, I have received basic drug investigation training. I have attended FBI-sponsored training focusing on the use of informants and cooperating witnesses. I have also attended additional gang and narcotics trainings sponsored by federal, state, and local law enforcement agencies. I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations. I have executed

warrants that have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug activities. As federal law enforcement acting in the capacity of a TFO, I have participated in numerous investigations involving the illegal distribution of controlled substances. I have coordinated controlled purchases of illegal drugs utilizing confidential sources and cooperating witnesses. I have coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs, illegal firearms and acts of violence to include homicide. I have conducted electronic and physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, and testified before federal grand juries regarding such matters. I have also interviewed admitted drug traffickers, drug users, informants, cooperating defendants, and other law enforcement officers regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. I have supervised the activities of informants and cooperating witnesses who have provided information and assistance in the federal prosecution of drug offenders, and I have participated in Title III investigations.

3. I am currently assigned to the FBI's Northern Connecticut Gang Task Force ("NCGTF"), an FBI sponsored Task Force consisting of officers from the Connecticut State Police (CSP), East Hartford Police Department (EHPD), Hartford Police Department (HPD), New Britain Police Department (NBPD), West Hartford Police Department (WHPD), and Connecticut Department of Correction. I am one of the case agents who have been involved in the investigation that is the subject of this Affidavit, along with other law enforcement agents and officers, and I am thoroughly familiar with the information contained herein.

4. This Affidavit is submitted in support of a criminal complaints and arrest warrants for the following individuals charging them with the listed statutes:

a. John MARRERO, a.k.a. "JJ" ("MARRERO") with a year of birth 2003, charging him with violating 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 922(a)(1)(A).

b. Liamdel MOLINA-MENDEZ, a.k.a. "Leo" ("MOLINA-MENDEZ") with a year of birth 2003, charging him with violating 18 U.S.C. §§ 922(a)(1)(A) and 2.

5. This Affidavit is also submitted in support of search warrants for the following locations or items:

a. 303 High Street, 3rd Floor, North ("3N"), New Britain, Connecticut ("**Target Premises 1**") which is a third floor apartment of a three story residential structure located on the east side of High Street between Broad Street and Carmody Street, described in further detail in Attachment A-1.

b. 303 High Street, 1st Floor, South ("1S"), New Britain, Connecticut ("**Target Premises 2**") which is a first floor apartment of a three story residential structure located on the east side of High Street between Broad Street and Carmody Street, described in further detail in Attachment A-2.

c. 303 High Street, basement, New Britain, Connecticut ("**Target Premises 3**") which is the basement of a three story residential structure located on the east side of High Street between Broad Street and Carmody Street, described in further detail in Attachment A-3.

d. A flip phone which is serviced by T-Mobile and assigned phone number (959) 212-9684 ("**Target Telephone-1**" or "**the -9684 number**"), and a smart phone which is serviced by T-Mobile and assigned phone number (959) 225-1068 ("**Target Telephone-2**") (collectively, the "**Target Telephones**"), described in further detail in Attachment A-4; and

e. A blue Toyota Camry with license plate CT BH56240, registered to an individual with initials J.R. whose name is known in full to me, but believed to be operated primarily by MARRERO and his father ("**Target Vehicle**"), described in further

detail in Attachment A-5.

## II. PROPOSED CHARGES

5. The proposed charges are defined as follows:

a. 21 U.S.C. § 841(a)(1) makes it a crime "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." This charge is proposed for MARRERO, along with the applicable penalty statute of 21 U.S.C. § 841(b)(1)(C).

b. 18 U.S.C. § 922(a)(1)(A) makes it a crime "for any person . . . except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce[]." This charge is proposed for both MARRERO and MOLINA-MENDEZ. MOLINA-MENDEZ would also be charged with aiding and abetting under 18 U.S.C. § 2.

## III. SUMMARY OF THE INVESTIGATION

6. Based on information received from Confidential Human Sources (hereinafter "CHS"), consensually monitored telephone calls and meetings, supervised purchases of controlled substances, physical surveillance, as well as the analysis cellular telephone call detail records ("CDRs"), as well as other information gathered in this investigation by myself and other law enforcement officers participating in this investigation, I have learned the following.

7. The NCGTF has been investigating the narcotics trafficking of John MARRERO, a.k.a. "JJ" ("MARRERO"), since approximately August of 2022. Since initiating the investigation, I, and other members of the NCGTF, have developed evidence that MARRERO and

his associates distribute quantities of fentanyl and illegal firearms in the Tolland Street area of East Hartford and High Street area of New Britain, Connecticut. As detailed below, law enforcement has executed numerous controlled purchases of narcotics from MARRERO and, as of the date of this affidavit, has purchased seven (7) firearms that MARRERO has illegally trafficked in the span of roughly seven (6) weeks. Not all of the controlled purchases are described in this affidavit, but rather, a select few examples which demonstrate probable cause for the requested warrants.

8. While conducting our investigation, investigators initially identified as (959) 212-9684 (**Target Telephone-1**) as a phone number utilized by MARRERO. This phone number was initially primarily used by MARRERO to arrange narcotics transactions with an FBI CHS. As the investigation progressed, MARRERO also used (959) 225-1068, hereinafter "**Target Telephone-2,**" to arrange firearms transactions via text, voice, and picture.[1] Through the course of the investigation, I, and other members of the FBI NCGTF have been present for phone communications between an FBI CHS and MARRERO, using both the -9684 number and the **Target Telephone-2**.

9. Through controlled purchases, investigators learned that MARRERO sells packaged, raw fentanyl and illegal firearms from **Target Premises 1**, which is his residence at 303 High Street, Apartment 3N, New Britain**.** A review of ATF databases identified that MARRERO does not possess a Federal Firearms License ("FFL"). Investigators also confirmed that MARRERO is not employed by an FFL retailer.

---

[1] On or about October 21, 2022, the Honorable Robert A. Richardson, United States Magistrate Judge, District of Connect, authorized a Pen Register/Trap and Trace order, as well as a warrant for location information, to be issued to T-Mobile, for Target Telephone-2. *See* 3:22-MJ-956 (RAR).

10. Additionally, through controlled purchases, investigators learned that Liamdel MOLINA-MENDEZ, a.k.a. "Leo" ("MOLINA-MENDEZ") supplies MARRERO with illegal firearms sold at **Target Premises 1.** A review of ATF databases identified that MOLINA-MENDEZ does not possess a Federal Firearms License ("FFL"). Investigators also confirmed that MOLINA-MENDEZ is not employed by an FFL retailer.

11. The MARRERO Drug Trafficking Organization (DTO) uses multiple locations to process, package, store, and distribute narcotics. More particularly, the MARRERO DTO uses the following locations and items to maintain and facilitate its drug trafficking enterprise:

- 303 High Street, 3rd Floor, North ("3N"), New Britain, Connecticut ("**Target Premises 1**") which is a third floor apartment of a three story residential structure located on the east side of High Street between Broad Street and Carmody Street. This the documented address for MARRERO which has been provided to the New Britain Police Department by MARRERO in previous police contacts.

- 303 High Street, 1st Floor, South ("1S"), New Britain, Connecticut ("**Target Premises 2**") which is a first floor apartment of a three story residential structure located on the east side of High Street between Broad Street and Carmody Street. This is the documented address for the family of an individual with initials J.B. and whose name is known in full to me (hereinafter "Individual-1"). Investigative databases also associated Individual-1 as registered to the address of 303 High Street. Further, through surveillance, Individual-1 has been observed entering/exiting this apartment.

- 303 High Street, basement, New Britain, Connecticut ("**Target Premises 3**") which is the basement of a three story resident structure located on the east side of High Street between Broad Street and Carmody Street. This is the basement of the residence which MARRERO told the CHS he has firearms hidden in the walls behind sheetrock.

- The **Target Telephones**.

- A blue Toyota Camry with license plate CT BH56240 ("**Target Vehicle**").

12. Part of this investigation involved the analysis of call detail records ("CDRs") and Pen Register Trap and Trace ("PR/TT") data obtained through the PR/TT order pertaining to the **Target Telephone-2.**

13. As described herein, the investigation has involved the use of a confidential human source ("CHS") to obtain information and to purchase controlled substances as well as firearms. The CHS has been a registered confidential source from the FBI since November 29, 2017. The CHS has been proven truthful, reliable, and credible through previous narcotics/firearms investigations conducted by the FBI and the NBPD where the CHS has conducted controlled purchases of narcotics and provided information that has been independently corroborated by law enforcement officers and other confidential sources. The CHS has been cooperating in exchange for monetary compensation. The CHS will be referred to as "he" throughout this affidavit, regardless of his/her actual gender.

**A. Probable Cause to Charge MARRERO and MOLINA, and to search Target Premises 1 and the Target Telephones**

*October 12, 2022 controlled narcotics and firearm purchase – 100 sleeves of fentanyl and stolen firearm*

14. On October 12, 2022, investigators met with the CHS in order to conduct a pre-arranged controlled purchase of 100 sleeves of fentanyl and a .45 caliber handgun with magazine and ammunition from MARRERO. This controlled purchase was audio/video recorded using audio/video recording equipment which was remotely monitored by myself and prerecorded FBI Investigative Funds were used ($950 total). According to CHS-1, MARRERO had previously indicated to CHS-1 that he would be willing to sell him drugs and/or a gun.

15. At approximately 5:15 PM, the CHS met with investigators at an undisclosed location. In the presence of investigators, the CHS placed an outgoing call to MARRERO's -9684 number (**Target Telephone-1**), MARRERO answered and the CHS ordered "two stacks" (or 200 bags) of fentanyl and told MARRERO that he would be going to his residence on High Street (**Target Premises 1**) around 7:00 PM. MARRERO responded that he would be around.

16. 14. At approximately 7:00 PM, the CHS again met with investigators at an undisclosed location. Investigators searched the CHS' person and vehicle for the presence of contraband or excess funds, with negative results. Investigators then provided $1100 in FBI Investigative Funds, an audio/visual recording/transmitting device was and directed to drive to MARRERO's High Street residence, and call MARRERO when he was close.

17. 15. At approximately 7:23 PM, investigators observed the CHS arrive at 303 High Street. Via the transmitting device, investigators overheard making a phone call on speaker phone. The CHS spoke with MARRERO who said he would be home in 10 minutes. The CHS then circled the block and returned to a secure location with investigators to wait for the phone call from MARRERO.

18. At approximately 7:31 PM, the investigators observed MARRERO's vehicle, a blue Toyota Camry, return to his residence. At approximately 7:34 PM, via the transmitting device, investigators overheard the CHS receive an incoming call from MARRERO. MARRERO told CHS he only had "one stack" for sale (100 bags). The CHS was then directed by investigators to make that purchase.

19. At approximately 7:35 PM, investigators observed the CHS arrive at 303 High Street and park in the rear of the building. Via the audio/visual recording, investigators MARRERO enter

the CHS' vehicle. Investigators then observed an exchange and then overheard the CHS ask about purchasing a gun. MARRERO responded that he had to charge his phone (presumably **Target Telephone-1**) and that he will send him a photo and have it (the gun) delivered in the next 30 minutes. MARRERO then exited the vehicle. CHS-1 left the parking lot and returned to the undisclosed location to meet with investigators.

20. At approximately 7:48 PM, via the remote audio/video recording, I overheard CHS receive a phone call. The call was placed on speaker-mode, allowing investigators to overhear the conversation. Investigators overheard the CHS advise that he received a video (which is believed to be in lieu of the "photo" MARRERO had referenced) and MARRERO said "30 minutes," or words to that effect. The CHS then met with investigators and the audio/video recording was deactivated. The CHS turned over the suspected fentanyl in a plastic bag and his/her vehicle was searched again for the presence of contraband or excess funds. The CHS provided investigators with $10 left over from the fentanyl buy and said the "stack" only cost $150. The CHS then showed investigators a video of a handgun which was sent from **Target Telephone-2** to the CHS. At approximately 8:10 PM, and in the presence of investigators, the CHS placed an outgoing call to MARRERO. MARRERO said, in sum and substance, that 30 minutes doesn't always mean 30 minutes and when he has it in his hands he will call.

21. At approximately 9:05 PM, and in the presence of investigators, the CHS placed an outgoing call to MARRERO which went unanswered. At approximately 9:08 PM, investigators observed a flatbed tow truck park in front of 303 High Street. An unknown male exited the tow truck and walked down the driveway. At approximately 9:15 PM, in the presence of investigators, the CHS received an incoming phone call from MARRERO telling him, in sum and substance,

that "his boy" came and to come get it. The CHS then was redeployed to 303 High Street, the audio/video recording was activated again, and investigators followed the CHS in his vehicle to 303 High Street.

22. At approximately 9:35 PM, the CHS placed an outgoing call to MARRERO and advised that he had arrived. Via the remote audio/video recording, investigators observed MARRERO enter the right front passenger seat and an unknown male got into the back seat of the CHS' vehicle. MARRERO introduced the CHS to a male that MARRERO referred to as his cousin named "Liamdel." The CHS reported that MARRERO has also referred to "Liamdel" as "Leo" on other occasions. MARRERO then handed the CHS a black satchel, which contained a silver handgun. MARRERO demonstrated how to operate firearm. The CHS then provided MARRERO with the $800 in FBI Investigative Funds.

23. At approximately 9:47 PM, the CHS left the area of 303 High Street address after MARRERO and the unknown male exited the vehicle. The CHS then drove directly back to the undisclosed location, followed by investigators. The CHS and his vehicle was searched again, and the CHS provided investigators with the black satchel which contained a silver firearm, magazine, and a plastic bag of ammunition as well as $150 in excess FBI Investigative Funds. At approximately 10:08 PM, investigators checked 303 High Street and no longer observed the flatbed tow truck in the area. With assistance of the CHS and using a known photograph of MOLINA-MENDEZ, investigators later identified the individual who arrived in the tow truck and was present in the CHS' vehicle for the firearm sale as MOLINA MENDEZ.

24. Investigators subsequently tested a small amount of the suspected fentanyl from inside one of the sleeves using a NARK II Fentanyl Reagent Test Kit and, after mixing with the

chemicals inside of the test kit, a positive reaction occurred for the presumptive presence of fentanyl. They also seized the firearm, a .45 Caliber Rock River Arms with serial number RA4763, silver magazine and six rounds of .45 caliber ammunition. NCIC information on that firearm returned that it was reported stolen in 2009 to the West Hartford Police Department. All evidence was logged, tagged and transported to the Custodian of Evidence at FBI NH.

*Call Detail Record ("CDR") Analysis Between the **Target Telephones** and MOLINA-MENDEZ's Telephone, ***-***-0815 on October 12, 2022*

25. Call Detail Records ("CDR") and subscriber information was obtained via FBI administrative subpoena for **Target Telephone-1**. No subscriber information was found. Investigators also examined CDR and subscriber information obtained via the same method for **Target Telephone-2**. The **Target Telephone-2** is subscribed to a relative of MARRERO. Additionally, investigators examined CDR and subscriber information obtained via the same method for the phone number (***) ***-0815, which is known in full to me and believed to be used by MOLINA-MENDEZ. The -0815 number is subscribed to MOLINA-MENDEZ's father.

26. From the examination of those records, investigators identified multiple contacts between MARRERO and MOLINA-MENDEZ (at the aforementioned -0815 number) immediately following the controlled purchase of fentanyl where the CHS requested to purchase the firearm up until the time where the tow truck arrived and the firearm transaction between the CHS, MARRERO and MOLINA-MENDEZ. For example:

At approximately 5:53 PM and 6:04, PM (***) ***-0815 calls **Target Telephone-2**

At approximately 7:23 PM, CHS-1 calls (***) ***- 9684.

*(MARRERO tells CHS-1 he will be home in 10 minutes and only has one stack to sell)*

At approximately 7:34 PM, (***) ***- 9684 calls CHS-1.

At approximately 7:36 PM, CHS-1 calls (***) ***- 9684

*(CHS-1 tells MARRERO he/she is pulling in the driveway)*

At approximately 7:46 PM, **Target Telephone-2** calls CHS-1.

*(MARRERO sent a video of a handgun)*

At approximately 7:47 PM, **Target Telephone-2** calls (***) ***-0815.

At approximately 7:48 PM, CHS-1 interacts with **Target Telephone-2**.

*(Possible data response from CHS-1' phone from video being sent/received)*

At approximately 7:48 PM, (***) ***- 9684 calls CHS-1.

*(MARRERO asks CHS-1 if he/she got the video and tells CHS-1 30 minutes that his boy is bringing it)*

At approximately 8:13 PM, **Target Telephone-2** calls (***) ***-0815.

At approximately 8:19 PM, (***) ***-0815 calls **Target Telephone-2**.

At approximately 8:22 PM, **Target Telephone-2** calls (***) ***-0815.

At approximately 8:27 PM, CHS-1 calls (***) ***- 9684

*(CHS-1 calls to get an update, MARRERO says 30 minutes doesn't always mean 30 minutes but he will call the CHS when he has it in hand)*

At approximately 8:47 PM, **Target Telephone-2** calls (***) ***-0815.

At approximately 9:04 PM, CHS-1 calls (***) ***- 9684.

*(CHS attempted to call MARRERO to postpone the buy but does not get an answer to call)*

At approximately 9:06 PM, LIAMDEL MENDEZ calls **Target Telephone-2**.

At 9:12 PM, Target Phone calls (***) ***-0815.

At approximately 9:15 PM, (***) ***- 9684 calls CHS-1.

*(MARRERO tells CHS-1 to come and he has it)*

At approximately 9:36 PM, CHS-1 calls (***) ***- 9684.
*(CHS calls to say he/she is pulling in)*

**B. Further Probable Cause to Charge MARRERO and MOLINA, and to search Target Premises 1, Target Telephone-2, and the Target Vehicle**

*October 18, 2022 Controlled Purchase for 100 Sleeves of Fentanyl and Firearm*

27. On October 18, 2022, members of the FBI Northern Connecticut Gang Task Force conducted a pre-arranged, controlled purchase of 100 sleeves of fentanyl and a Smith & Wesson M&P Shield .380 Caliber handgun with magazine and 8 rounds of .380 caliber ammunition from MARRERRO. The controlled purchase was conducted between the aforementioned CHS and MARRERO using prerecorded FBI Investigative Funds ($150 for fentanyl, $900 for firearm, $1050 in total), audio/video recording equipment which can be remotely monitored by investigators, and physical surveillance.

28. Prior to this controlled purchase, surveillance had been conducted by members of the FBI NCGTF in the area of New Britain Avenue in Hartford, CT. This surveillance was conducted on MARRERO in an attempt to identify associates and observe MARRERO after being contacted by the CHS in order to determine if MARRERO meets with the same male (MOLINA-MENDEZ) as the previous controlled firearms purchase.

29. At approximately 5:00 PM, investigators with the CHS at an undisclosed location and requested the CHS to contact MARRERO via telephone, order a "stack" of fentanyl, and inform him that he had money for the firearm for sale and establish a time for him to meet with MARRERO. Around that same time as that call, investigators conducting surveillance observed that MARRERO had gone inside of Walmart on Flatbush Avenue in Hartford.

30. At approximately 5:06 PM, and in my presence of investigators, the CHS called MARRERO at the -9684 number (**Target Telephone-1**). MARRERO advised that he was in Walmart and had to go pick up his father from Hartford and would meet him at the spot. During the phone call, MARRERO's phone died.

31. At approximately 5:08 PM, the CHS received an incoming call phone call on MARRERO's second phone number, the **Target Telephone-2**. The call was placed on speaker-mode, allowing investigators to overhear the conversation. MARRERO advised his phone died and that the gun for $800 was sold and he only had the one for $900 and he would sell his own gun for $1500 right now. The CHS responded that he would call him back. At approximately 5:13 PM, in my presence, the CHS called MARRERO back and said he would buy the stack and the $900 gun.

32. At approximately 5:36 PM, investigators observed MARRERO's vehicle, the **Target Vehicle**, parked in the parking lot across from an address White Street known in full to me. Investigators were unable to determine if MARRERO was inside or outside of the vehicle. Investigators then observed a tow truck arrive—the same tow truck seen on October 12, 2022, at the High Street address of the Target Premises—and the operator of the tow truck engage in conversation with MARRERO through his driver's side window.

33. At approximately 5:40 PM, investigators identified that the tow truck as a "Quality Care Towing" tow truck. During the course of this investigation, law enforcement obtained positive identification of MOLINA-MENDEZ, with a year of birth of 2003, as being employed as a tow truck driver for "Quality Care Towing" in East Hartford, which is utilized by the East Hartford Police Department to provide tow service.

34. From approximately 6:15 PM to 6:33 PM, investigators followed the MARRERO, operating the **Target Vehicle**, as he traveled to an address on Tolland Avenue known in full to me and apparently used as an auto body shop in East Hartford, CT. Investigators then observed the **Target Vehicle** as it parked in the parking lot. Investigators observed MARRERO and a person identified as his father unlock the gate and enter into the auto body shop.[2] Due to darkness and limited visibility, investigators were unable to observe activity at this location until investigators observed the **Target Vehicle** leave the area at approximately 6:40 p.m. Investigators then followed the **Target Vehicle** from East Hartford to MARRERO's residence of 303 High Street in New Britain.

35. At approximately 7:34 PM, investigators met with the CHS at an undisclosed location where he and his vehicle was searched for illegal substances, firearms and/or excess US currency to which none was located. The CHS was provided audio/video recording equipment and $1060 of pre-recorded FBI Investigative Funds. While in the presence of investigators, the CHS received an in-coming phone call from MARRERO asking him how long it would take to arrive because he (MARRERO) has to go back to East Hartford. Audio/video recording was activated and the CHS was deployed to the area of 303 High Street, New Britain, CT. After arriving, via the remote audio/video recording, investigators observed MARRERO enter the CHS' vehicle and sell the fentanyl and firearm with magazine in exchange for the FBI Investigative Funds. Investigators then followed CHS as he left the area returned to the meet location where the CHS was debriefed by investigators and provided the following information.

[2] MARRERO's father has also been observed operating the **Target Vehicle**, and the vehicle itself is not registered to either MARRERO or his father. The requested warrant in this case would be expressly seeking permission to search the vehicle even if it is located while MARRERO's father is operating it.

36. He said that when he arrived at 303 High Street, MARRERO came out of the rear stairwell with a backpack, went to the **Target Vehicle** which was parked outside the residence, and did something to the dashboard then reach towards the rear seat. The CHS said he believed there is a trap compartment in the **Target Vehicle** based on how MARRERO did something to the dashboard then reached towards the rear seats before retrieving an item(s). MARRERO then walked from the **Target Vehicle** directly to the CHS, who had been waiting in his own vehicle, and provided the CHS with the firearm with ammunition in a zip lock bag and the suspected fentanyl. The CHS paid MARRERO $1060, and was given $10 in change and MARRERO got out of the car.

37. Investigators tested a small amount of the suspected fentanyl from inside one of the 100 sleeves, which had been stamped “Panther,” of suspected fentanyl using a NARK II Fentanyl Reagent Test Kit and after mixing with the chemicals inside of the test kit, a positive reaction occurred for presumptive presence of fentanyl. The 100 sleeves were tagged and later transported to the Custodian of Evidence at FBI NH. Law enforcement ran the Smith & Wesson, M&P Shield .380 caliber handgun with serial number NKM3752 through NCIC and determined it had not been reported as stolen. The handgun with the empty magazine and 8 rounds of .380 caliber ammunition in a plastic bag were tagged and later transported to the Custodian of Evidence at FBI New Haven.

38. Investigators have reviewed the audio/video recording of the controlled purchase and confirmed that, as viewed in real time, the account of the controlled purchase by the CHS was consistent with what was overheard and/or observed in the audio/video recording.

*Call Detail Record (“CDR”) Analysis Between **Target Telephone-2** and MOLINA-MENDEZ’s Telephone, ***-***-0815 on October 18, 2022 Coinciding with Surveillance*

39. Investigators examined Call Detail Records (“CDR”) and subscriber information

obtained via FBI administrative subpoena for the phone number subscribed to MOLINA-MENDEZ's father and believe to be used by MOLINA-MENDEZ as referenced previously in the description of the controlled purchase from October 12, 2022. A review of those records yielded the following:

At approximately 5:25 PM on October 18, 2022, the **Target Telephone-2** called MOLINA-MENDEZ.

At approximately 5:29 PM, PM, the **Target Telephone-2** called MOLINA-MENDEZ.

At approximately 5:36 PM, investigators observed MOLINA-MENDEZ at the driver's side window of MARRERO's blue Toyota Camry in the parking across from 234 White Street in Hartford, CT.

At approximately 6:58 PM, the **Target Telephone-2** called MOLINA-MENDEZ.

At approximately 7:43 PM, the CHS engaged in the controlled purchase of the fentanyl and firearm at 303 High Street with MARRERO.

At approximately 7:50 PM, the **Target Telephone-2** called MOLINA-MENDEZ.

At approximately 8:30 PM, MOLINA-MENDEZ called the **Target Telephone-2**.

**C. Further Probable Cause to Charge MARRERO and to Search Target Premises 1 and Target Premises 3**

*October 25, 2022 controlled purchase for 16 grams of Fentanyl and Two Firearms*

40. On October 25, 2022, law enforcement conducted a prearranged controlled purchase of 16 grams of fentanyl and two handguns from MARRERO. The controlled purchase was conducted between the aforementioned CHS, using pre-recorded FBI Investigative Funds ($800) and pre-recorded ATF Investigative Funds ($2800), audio/video recording equipment which can be remotely monitored by investigators and physical surveillance.

41. At approximately 5:45 PM, in the presence of investigators, the CHS called MARRERO made arrangements to purchase 16 grams of fentanyl for $800 and two firearms ($1500 for one and $1300 for the second) from MARRERO. MARRERO directed the CHS to meet at "the spot" (a spot previously identified from controlled purchases at 303 High Street, New Britain, CT) in New Britain in a half hour.

42. At approximately 6:15 PM, investigators met with the CHS at a secure undisclosed location in New Britain. The CHS was searched for the presence of contraband funds with negative results. At approximately 6:25 PM, the CHS received an incoming phone call from MARRERO who advised that he was leaving East Hartford now and returning to New Britain. At nearly that the same time, at approximately 6:26 PM, investigators observed the **Target Vehicle** leave the Tolland Street auto body shop in East Hartford, CT. The **Target Vehicle** was then followed by investigators to 303 High Street in New Britain, CT.

43. At approximately 6:53 PM, in the presence of investigators, the CHS received an incoming phone call from MARRERO who directed the CHS to "come by," or words to that effect. An Audio/video recording device was activated and the CHS was deployed to conduct the controlled purchase. At approximately 7:01 PM, investigators observed the CHS pull into the driveway at 303 High Street. At approximately 7:06 PM, via the transmitting device, investigators overheard MARRERO enter the CHS' vehicle and a discussion ensued regarding the availability fully automatic firearms and prices.

44. At approximately 7:08 PM, via the transmitting device, investigators determined that the transaction of fentanyl and firearms by MARRERO with the CHS was complete. The CHS was then followed by investigators back to the secure location, arriving at approximately

7:20 PM.

45. At approximately 7:24 PM, both firearms and magazines were taken into ATF custody. The CHS, in the presence of investigators, received an incoming call from MARRERO. MARRERO advised that the bag of powder he/she was given was the "wrong one," or words to that effect.

46. At approximately 7:39 PM, the CHS was redeployed to 303 High Street with audio/video recording equipment activated in order meet with MARRERO. At approximately 7:52 PM, via the transmitting device, investigators determined that MARRERO had entered the CHS's vehicle, taken the original bag of white powder and exited the CHS' vehicle, returning to Target Premises 1. At approximately 7:56 PM, via the transmitting device, investigators determined that MARRERO was back inside of the CHS' vehicle and at approximately 7:59 PM, MARRERO had exited the vehicle. At some point in between approximately 7:52 PM and 7:59 PM, MARRERO had replaced the bag of white powder he had given to the CHS with the originally intended product. Audio/video recording was deactivated and the CHS was followed back to the undisclosed meet location by investigators.

47. At approximately 8:15 PM, investigators met with the CHS who provided one plastic bag containing a white powder and one magazine. The magazine was transferred into the custody of the ATF and the CHS provided excess investigative funds from the fentanyl purchase to the FBI and excess investigative funds to the ATF.

48. The CHS was then debriefed and provided the following information. CHS advised that he contacted MARRERO via **Target Telephone-2** and asked for $850 of raw fentanyl and two firearms. MARRERO agreed and told him that he would provide him with 16 grams for $800.

MARRERO then told him that he was in East Hartford and would call him when he arrived to his residence in New Britain.

49. A short time later, he received a phone call from MARRERO who said he was home and to come by. He said he went to MARRERO's residence and parked in the rear parking lot. He said MARRERO came out of the rear stairwell, which leads up to the third floor apartments, and got into his/her vehicle. MARRERO pulled out two firearms with magazines and ammo from within the backpack and showed him how one works. He gave MARRERO $2800 for the firearms and MARRERO gave him a small, knotted plastic bag of suspected fentanyl for which the CHS gave him $800. MARRERO told him he misplaced one of the magazines and would provide it at a later date.

50. The CHS said MARRERO offered to sell him a full automatic machine gun that looked like an "Uzi" which would cost $2200. He said after he returned to meet with investigators and during debrief, MARRERO called him and said he needed the fentanyl back. He said he returned to meet with MARRERO who said the bag was overweight and not the right bag, or words to that effect. MARRERO then took the bag, went inside and came out several minutes later with the same bag previously provided. MARRERO told him that he had to take out 3-4 grams and the bag now weighed 16 grams which is what he paid for. MARRERO bragged about having access to kilogram quantities and gave him the missing magazine which he stated he located when he "back upstairs." or words to that effect, and that the magazine was loaded with ammunition.

51. Law enforcement later tested a small amount of the white powder from inside of the plastic bag of suspected fentanyl using a NARK II Fentanyl Reagent Test Kit and after mixing with the chemicals inside of the test kit, a positive reaction occurred for the presumptive presence

of fentanyl.

52. The first firearm is a .40 caliber handgun with Glock model 22 upper receiver, with serial number DDR345 and tan lower firing mechanism equipped with a laser sight, along with a 10 round magazine and a plastic bag containing .40 caliber ammunition was transferred into ATF custody to be processed/tagged/logged into ATF evidence.

53. The second firearm, a 9mm handgun, SCCY model CPX-2, with serial number 732960 with one loaded magazine, one empty magazine and one extended magazine along with a plastic bag containing 9mm ammunition was transferred to ATF to be processed/tagged/logged into ATF evidence.

54. I reviewed the audio/video recordings of the controlled purchase and confirmed that, as viewed in real time, the account of the controlled purchase by the CHS was consistent with what was overheard and/or observed in the audio/video recording. Worth noting is that during the controlled purchase, MARRERO told the CHS the following about where he stores contraband: "That shit is in the wall, with sheetrock, compound and everything… compound you can break through the wall, ya feel me?" He also stated that "it's meant, it's in the basement, it's meant for that shit. Ya' feel me? I'm out here, ya feel me? If anything it's just EH and then smack the wall." Based on my training and experience with this investigation and others, I believe that MARRERO indicated that he stores firearms in the basement of 303 High Street (**Target Premises 3)** when he states, "it's in the basement."

**D. Further Probable Cause to Charge MARRERO and MOLINA-MENDEZ**

*October 28, 2022 controlled purchase for 100 Sleeves of Fentanyl and Fully Automatic Firearm*

55. On October 28, 2022, law enforcement conducted a prearranged controlled

purchase of 100 sleeves of fentanyl and a "Chiappa" MFour-22 .22 caliber firearm with magazine and .22 caliber ammunition from MARRERO. This controlled purchase was made using the aforementioned CHS, $150 in FBI Investigative funds, $2200 in ATF Investigative Funds, audio/video recording equipment and physical surveillance and in response to MARRERO previously stating that he had a fully automatic gun for sale for $2200.

56. At approximately 10:30 AM, investigators met the CHS at an undisclosed and secure location. At approximately 10:41 AM, and the presence of investigators, the CHS made a recorded outgoing call to MARRERO at **Target Telephone-1**. There was no answer. At approximately 10:43 AM, again in the presence investigators, MARRERO called the CHS back and confirmed he still has the firearm for sale.

57. At approximately 10:50 PM, in the presence of investigators, the CHS called MARRERO. The call was placed in speaker-mode, allowing investigators to overhear the conversation. MARRERO answered an advised that "his brother" did not get out of work until 5:00 PM, and he would get the firearm for the CHS after then but "no later than 7," or words to that effect. The CHS said he was willing to pick him up and drive him to get it. MARRERO explained that "his brother Leo" works until 5 PM at the shop so it would have to be after 5 PM.

58. Investigators directed the CHS to call MARRERO back and tell him he will purchase the "stack" now and delay buying the gun if it was after 5 PM. Investigators again overheard the phone conversation between the CHS and MARRERO. The following is a summary of that conversation. MARRERO explained that "Leo" gets out of work at "the shop" at 3 PM and needs to be at his other job by 4 PM.

59. At approximately 2:08 PM, investigators observed MARRERO exit the gas station

on Farmington Avenue in New Britain and walk to 303 High Street. Around the same time, investigators also observed a grey Pacifica, bearing CT license plate BB23348, pull into the rear of 303 High Street. At approximately 2:45 PM, the Pacifica exited the rear driveway of 303 High Street and drove to the Citgo Gas Station located on Farmington Avenue. Investigators observed MARRERO was located in the right front passenger seat and MOLINA-MENDEZ was the operator. I observed MARRERO enter the gas station and exit with two beverages, met with an unknown male and engaged in a suspected hand to hand drug transaction.

60. At approximately 4:49 PM, investigators followed the Pacifica (with MARRERO and MOLINA-MENDEZ inside) to the area of Oak Street and LaSalle Street in New Britain. At approximately 2:55 PM, investigators followed the Pacifica to 303 High Street and at 2:59 PM, observed it pull down the driveway of 303 High Street to the rear.

61. At approximately 3:05 PM, investigators observed the Pacifica exit the driveway. The Pacifica was then followed by investigators but visual was lost in the area of I-84 and Capital Avenue in Hartford.

62. At approximately 3:40 PM, the CHS was directed make an outgoing call with MARRERO and speak with him. Shortly thereafter, the CHS reported that he made telephonic contact with MARRERO. MARERRO told the CHS that "he is about to be in New Britain and come by the house."

63. At approximately 4:12 PM, investigators observed MARRERO in the back parking lot of 303 High Street.

64. At approximately 4:20 PM, investigators met with CHS at a secure location. The CHS and his vehicle were searched for contraband and excess funds with negative results. The

CHS was then provided with $150 in FBI Investigative Funds, $3000 ATF funds ($2200 to be used for the firearm purchase) and audio/video recording equipment. At approximately 4:24 PM, and in the presence of investigators, the CHS received an incoming phone call from MARRERO who advised that he has the requested contraband.

65. At approximately 4:34 PM, the CHS was deployed to 303 High Street and audio/video recording was activated. At approximately 4:40 PM, investigators observed the CHS pull down the driveway of 303 High Street and at about the same time, via the transmitting device, investigators overheard the CHS call MARRERO telling him he was in back.

66. At approximately 4:36 PM, I observed, via the remote audio/video recording, MARRERO enter into the CHS's vehicle with a red backpack and demonstrated how to use the firearm. At approximately 4:36 PM, I overheard, via the transmitting that MARRERO said he left the "stack" on the kitchen table and was going back to get it, or words to that effect. MARRERO exited the CHS's vehicle, then returned, got back into the vehicle and the two spoke about narcotics. At approximately 4:52 PM, the CHS's vehicle was observed leaving the driveway and was followed back to the undisclosed location by investigators.

67. At approximately 4:59 PM, the CHS is met by investigators as the secure location. The CHS turned over a red back pack containing a "Chiappa" firearm with magazine and ammunition and a "stack" of suspected fentanyl. The CHS' person and vehicle were then searched for the presence of contraband and excess funds with negative results. The CHS was then debriefed by investigators and provided the following information.

68. The CHS said that he met with MARRERO in his vehicle who provide him with a red backpack with the firearm, and that MARRERO then showed the CHS the firearm and how to

operate it. MARRERO also advised that he could get the CHS more ammunition. MARRERO explained the firearm shoots "full auto" and to just pull the trigger and it would go "bang bang bang bang," or words to that effect. MARRERO told him he tried to get $200 off the price but that "his bro" wouldn't change the price.

69. Investigators later tested a small amount of pink powder from inside of the suspected sleeves of fentanyl using a NARK II Fentanyl Reagent Test Kit and after mixing with the chemicals inside of the test kit, a positive reaction occurred for the presumptive presence of fentanyl. The 100 sleeves of fentanyl were retained by the FBI for logging/tagging/processing and later transported to FBI NH to the Custodian of Evidence.

70. The "Chiappa" MFour-22, .22 Caliber handgun with obliterated serial number with 30 round magazine with .22 caliber ammunition were turned over to the ATF for logging/tagging/processing.

71. Investigators later reviewed the audio/video recording of the controlled purchase and confirmed that, as viewed in real time, the account of the controlled purchase by the CHS was consistent with what was overheard and/or observed in the audio/video recording.

**E. Further Probable Cause to Charge MARRERO and to Search Target Premises 2**

*November 9, 2022 Controlled Purchase for 19 grams of Fentanyl*

72. On November 9, 2022, members of the FBI NCGTF conducted a prearranged controlled purchase of 19 grams of raw, unpackaged fentanyl from MARRERO. This controlled purchase was made using the aforementioned CHS, $1000 in pre-recorded FBI Investigative funds, audio/video recording equipment and physical surveillance.

73. At approximately 4:00 PM, investigators established surveillance in the area of 303 High Street in New Britain, CT. At approximately 4:23 PM, the CHS contacted investigators and

advised that MARRERO had called him and said he had the fentanyl and was leaving work and would be home soon. At approximately 4:40 PM, investigators met with the CHS at a secure undisclosed location. Investigators searched the CHS' persona and vehicle for contraband and excess funds with negative results. The CHS was then provided $1000 in FBI Investigative Funds and was instructed to meet with MARRERO and purchase $1000 worth of raw fentanyl and inquire as to the source of fentanyl.

74. At approximately 5:00 PM, investigators observed MARRERO's blue Toyota Camry with CT Registration BH56240, arrive and park in the rear parking lot of 303 High Street. The CHS when then deployed by investigators, who then activated the audio/video recording. At approximately 5:08 PM, investigators observed the CHS pull down the driveway of 303 High Street and, via the transmitting device, investigators overheard the CHS make an outgoing call to MARRERO and tell him that he was there.

75. At approximately 5:11 PM, via the transmitting device, investigators overheard the CHS saying that a heavyset male from the first floor (known to investigators to sue an alias of "Gordo," with initials J.B. and whose name is known in full to investigators, with a year of birth 1989 and an address of 303 High Street 1S, New Britain CT) exited his apartment. In conversations with law enforcement, the CHS reported that he often saw J.B. hanging around outside of **Target Premises 2** when he (the CHS) was conducting deals with MARRERO.

76. At approximately 5:12 PM, via the transmitting device, investigators determined that MARRERO was in the CHS' vehicle and the product was provided to the CHS. MARRERO talked about two other firearms he said he would have to go get from "where it's at."

77. At approximately 5:18 PM, via the transmitting device, investigators overheard

MARRERO offer to sell the CHS fentanyl for $55 a gram, and then exit the vehicle. Around the same time, investigators observed the CHS' vehicle exit the driveway and subsequently return to the undisclosed location. The audio/video recording was deactivated.

78. At approximately 5:25 PM, investigators met with the CHS at an undisclosed secure location. The CHS turned over a knot tied bag of suspected fentanyl. Investigators then searched the CHS' person and vehicle for the presence of contraband and excessive funds with negative results. The CHS was then debriefed by investigators and provided the following information.

79. The CHS advised that he called MARRERO at his identified **Target Telephone-2** and when he/she pulled into the driveway MARRERO said he'd be coming down. The CHS explained that after making the call, "Gordo," who lives in the first floor South apartment (**Target Premises 2**) exited the building and placed the suspected fentanyl on a ledge of the building. The CHS explained that MARRERO then came down from the third floor of **Target Premises 1** (after the CHS saw him appear in the window on the third floor landing), grabbed the suspected fentanyl from the ledge and got into the CHS's vehicle. MARRERO gave him a knot tied bag of suspected fentanyl and spoke about having two more firearms for sale and that a "ghost" gun that he is 50/50 in on with his father is for sale. During the conversation MARRERO kept pointing towards the first floor South apartment (**Target Premises 2**) as he spoke about the guns and said he would have to grab it. MARRERO then exited the vehicle and spoke with "Gordo." MARRERO appeared to give him cash and then "Gordo" went back into **Target Premises 2** and MARRERO went back upstairs to **Target Premises 1**.

80. The CHS explained that he is convinced that "Gordo" is holding/selling street-level amounts of fentanyl, and likely firearms, or is otherwise providing security for MARRERO,

because he frequently observes that when he (the CHS) arranges a purchase of fentanyl or firearms from MARRERO, "Gordo" comes outside. Further, he said during the last controlled purchase, he has seen MARRERO providing cash to "Gordo" after the sale and asking him for change to break the CHS's investigative funds.

81. The CHS reminded investigators that when he was hanging out with MARRERO and "Gordo" previously (outside of the context of a controlled purchase), "Gordo" had told him that he is from New York. According to the CHS, "Gordo" showed him a video of a shooting homicide on his phone and said he knows who the shooter in the red jacket is.

82. The CHS explained that "Gordo" always exits from the left of the white door on the first floor landing that would lead into the first floor South apartment (**Target Premises 2**).

83. I tested a small amount of the white powder from inside the knot tied bag of suspected fentanyl using a NARK II Fentanyl Reagent Test Kit and after mixing with the chemicals inside of the test kit, a positive reaction occurred for the presumptive presence of fentanyl. Approximately 19 grams of fentanyl was retained by the FBI and logged/tagged/processed and later transported to FBI NH to the Custodian of Evidence.

*Positive Identification of "Gordo"*

84. Following the above listed controlled purchase, investigators conducted New Britain Police Department in-house record checks of 303 High Street 1 South in New Britain Connecticut (**Target Premises 2)** and found past history with the J.B. aka's "Gordo's" family residing at that location. Through various investigative databases, I obtained a NY/NJ HIDTA mugshot of J.B., who provided the address of 303 High Street, 1S, in New Britain CT (**Target Premises 2)** to the DMV for ID card purposes. J.B. a.k.a. "Gordo" is a convicted felon out of NY

with a criminal history of domestic violence and forgery/larceny. The mugshot obtained was from 2015; however, was more recent than the DMV ID card photo. After obtaining the mugshot, I showed a cropped version of it to the CHS who immediately said, with certainty, that the male in the photograph is "Gordo" who lives at **Target Premises 2**.

*MARRERO and New Britain Police Department History with*
*303 High Street 3N, New Britain CT*

85. From reviewing the NBPD in-house police records, investigators identified that MARRERO had previous police contacts with members of the NBPD where he provided the address of 303 High Street, 3N in New Britain CT (**Target Premises 1**). These incidents occurred on June 24, 2021, documented under NBPD IR21-018552, February 18, 2022, documented under NBPD IR22-005358, April 7, 2022, documented under NBPD IR22-010490 and on September 5, 2022, documented under NBPD IR22-026653.

*November 17, 2022 Controlled Purchase of 200 sleeves of Fentanyl and a Firearm*

86. On the November 17, 2022, law enforcement conducted a prearranged controlled purchase of 200 sleeves of fentanyl and a "P80" 9mm handgun with one extended magazine, one magazine 11 rounds of 9mm ammunition from MARRERRO. This controlled purchase was made using the aforementioned CHS, $300 in FBI Investigative funds, $900 in ATF Investigative Funds, audio/video recording equipment and physical surveillance.

87. At approximately 5:00 PM, the CHS was met by investigators at an undisclosed location. The CHS' person and vehicle were searched for the presence of contraband and excess funds with negative results. Investigators directed the CHS to make an outgoing call to MARRERO via his identified the -9684 number and order 200 sleeves of packaged fentanyl and a "ghost" gun with extended magazine that was previously offered for sale. The CHS was provided

audio/video recording equipment. In the presence of investigators, the CHS placed an outgoing call to MARRERO. MARRERO answered and said he has it, that he has to package it and to give him one hour, or words to that effect. The CHS acknowledged and ended the call. Investigative personnel then established surveillance in the area of 303 High Street (**Target Premises 1 – 3**).

88. At approximately 5:50 PM, investigators provided the CHS with $300 in FBI Investigative Funds, $2000 in ATF Investigative Funds ($900 expected for purchase) and deployed the CHS to the area of 303 High Street, directing the CHS to call MARRERO when he arrived in the driveway.

89. At approximately 6:03 PM, investigators observed the CHS pull down the driveway. Via the transmitting device, investigators overheard the CHS call MARRERO who advised he needed some time and would be coming downstairs. MARRERO directed the CHS to park in the driveway. Shortly thereafter, and at approximately 6:06 PM, law enforcement observed movement on the third floor.

90. At approximately 6:14 PM, investigators observed MARRERO and an unknown male in the third floor window of **Target Premises 1**. Shortly thereafter and at 6:15 PM, via the transmitting device, investigators overheard CHS receive an incoming phone call from MARRERO who said he was bringing down one of the guns with “extra food” down now. Investigators then observed MARRERO look out the third floor window.

91. At approximately 6:21 PM, investigators observed a white Mercedes pull down the driveway of 303 High Street and observed a male walk down the driveway with a cell phone and carrying a bag. Via the transmitting device, the CHS advised that unknown male was MARRERO, and that MARRERO was serving an individual in the white Mercedes.

92. At approximately 6:22 PM, via the transmitting device, investigators overheard MARRERO enter the CHS' vehicle. Investigators further identify that MARRERO provided the CHS with the firearm, magazine and fentanyl. The CHS and MARRERO further discuss the potential of making a trip together out of state to deliver/sell narcotics.

93. At approximately 6:27 PM, investigators observe MARRERO exit the CHS' vehicle and the CHS depart the area in his vehicle. The CHS was then followed by investigators back to the secure location. At approximately 6:29 PM, investigators surveilling the **Target Premises** observed MARRERO walk into J.B.'s apartment (**Target Premises 2**).

94. At approximately 6:30 PM, the CHS advised investigators that he observed a book bag put into a grey Toyota Corolla which arrived at 303 High Street around the time of the Mercedes arrival. Investigators observed an unknown male that exited the Corolla with the backpack enter **Target Premises 2,** after MARRERO and after the CHS exited the area. Shortly thereafter, investigators followed the Corolla as it departed the area.

95. At approximately 6:36 PM, investigators observed the Mercedes exit the driveway and travel north. The Mercedes was operated by an older Hispanic male with a goatee. Investigators identify that the operator of the Mercedes was the same male that met with J.B. and MARRERO in the driveway.

96. At approximately 6:38 PM, investigators observed the Toyota pull into the driveway of an address on Pleasant Street in Hartford, known in full to me.

97. At the secure location, the CHS provided investigators with a bag containing a P80 9mm handgun, extended magazine, regular magazine, 11 rounds of ammo. Also provided was a zip lock bag containing 200 sleeves of suspected fentanyl. The CHS provided $1100 in remaining

ATF Investigative Funds to law enforcement. The CHS' person and vehicle were again searched for the presence of contraband or excess funds with negative results.

98. The "P80" 9mm handgun, extended magazine, regular magazine and 11 rounds of 9mm ammunition were turned over to ATF for logging/tagging/processing. Investigators tested a small amount of the pink powder from inside one of the sleeves of suspected fentanyl using a NARK II Fentanyl Reagent Test Kit and after mixing with the chemicals inside of the test kit, a positive reaction occurred for the presumptive presence of fentanyl. Approximately 200 sleeves stamped "Scorpion" and "Panther" were retained by the FBI for logging/tagging/processing and later transported to FBI NH to the Custodian of Evidence. The audio/video from the controlled purchase was tagged and submitted to the Custodian at FBI NH.

99. The CHS was then debriefed by investigators and provided the following information. At the secure location and the direction of investigators, the CHS placed an outgoing call to MARRERO and ordered two stacks (200 sleeves) of fentanyl and inquired if the gun was still for sale that MERRERO previously offered to sell. MARRERO said he had both and needed an hour to package the stacks.

100. The CHS placed an outgoing call MARRERO as soon as he arrived in the driveway of 303 High Street. MARRERO answered and advised it would be a few minutes before he would be down. The CHS parked and waited for MARRERO. After parking, the CHS observed a grey Toyota Corolla and white Mercedes pull down the driveway. MARRERO called him and said he was bringing the gun with food down. The CHS observed "Gordo" (J.B.) exit from his apartment and stand on the back porch and smoke a cigarette. The CHS then observed MARRERO appear from possibly the basement door (though the CHS was unsure due to his vehicle's position) and

make a suspected drug transaction with the older, short, Hispanic male who exited from the white Mercedes.

101. MARRERO then entered the CHS' vehicle and showed him a bag containing the handgun with magazines and ammunition. MARRERO also put a bag of bundles of fentanyl on the passenger-side floor of the car and the CHS gave MARRERO $1250 of FBI and ATF money which MARRERO did not count and put directly into his pocket saying he "knows it's good," or words to that effect. MARRERO said he was in a rush but the CHS told MARRERO that he wants to bring "weight" to someone in Vermont/New Hampshire. He asked MARRERO how long it would take him to get the order ready and MARRERO said a "few hours, 12 hours, a day" to get it ready and the CHS said to just let him know that he has it. He said he was going to Florida in the morning to see family and would be returning next week and to be ready. MARRERO said he was and wanted to speak to him later.

102. The CHS told MARRERO that he is looking for apartments for him on the East side of New Britain and that there are two options. He said MARRERO was excited about an apartment in New Britain and indicated that he has not found one yet but first or second week of December would be perfect. MARRERO said he was interested and got out of the car. The CHS advised that he saw "Gordo" go into apartment 1S (**Target Premises 2**) and MARRERO follow him inside.

103. The CHS advised that an unknown male exited the passenger side of the Toyota Corolla with a weighed down backpack and put the backpack into either the Mercedes or **Target Vehicle**. The CHS explained a heavyset male walked in the bag with a backpack and was waiting for MARRERO. CHS believed that everyone in the back parking lot was waiting on MARRERO.

The CHS explained that the backpack was very heavy. The CHS explained that he lost sight of everyone as he left.

104. At approximately 9:00 PM, the CHS contacted investigators and advised that MARRERO called him and told him he got the "big toy" up (which the CHS assumed is the rifle MARRERO had said he had earlier).

*Additional Information relevant for probable cause*

57. During my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved, in part, drug trafficking violations, the flow of the illegal proceeds obtained from drug trafficking, and related offenses such as violations of firearms laws. My involvement in these investigations has resulted in the successful prosecution of numerous individuals and the forfeiture of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate these violations. Search warrants relating to these investigations have covered vehicles, residences of drug traffickers and their co-conspirators, "stash houses" used as storage and distribution points for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

58. Materials searched for and recovered in these locations have included various controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names, addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; wireless telephones, paging devices, computers and computer disks, answering machines; and

various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking. These items obtained by search warrants, constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

59. Based on my training, experience, and participation in this and other drug and firearms trafficking investigations, I know that:

a. Drug and firearm traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

b. drug and firearm traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

c. even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d. drug and firearm traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business;

e. drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

f. drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore the above mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g. drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

h. drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates;

i. drug and firearm traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug and firearm transactions. However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts;

j. drug and firearm traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances and/or firearms, as well as records and receipts reflecting the expenditure of drug/firearm proceeds for personal and business assets;

k. drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug/firearm transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

l. drug/firearm traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

m. persons involved in drug/firearm trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

n. drug/firearm traffickers often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased

with drug proceeds. These photographs and video movies are normally in the drug traffickers possession or residence;

o. the State of Connecticut is generally viewed as a consumer state in regards to narcotic activity. However, it is common for drug traffickers to travel to major distribution centers such as New York to purchase their narcotics for distribution. It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. It is known that drug traffickers' methods include, but are not limited to: commercial airlines, private motor vehicles, tractor trailer units, public transportation, and motor vehicles with concealed compartments, and government and contract mail carriers. It is known that the residences of drug traffickers will often contain records of drug related travel. These records may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

p. based on my training and experience, drug/firearm traffickers commonly have their own firearms, ammunition and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to handguns, rifles, shotguns, automatic weapons, knives, ammunition, and magazines. These firearms and weapons are most often kept to protect and secure drug/firearm traffickers' property;

q. based on my training, experience and participation in this and other drug/firearm trafficking investigations, I know that it is generally a common practice for drug/firearm traffickers to store their drug inventory and drug related paraphernalia in their residences, cars or those of trusted associates. The drug paraphernalia frequently includes scales, funnels, sifters, grinders, plastic bags, heat sealing devices, and dilutant;

r. based on my training and experience, drug/firearm dealers often create secret locations, commonly called "traps" or "hides" in their automobiles and residences. Often, drug/firearm dealers will use these traps or hides to conceal and store narcotics, weapons, money and other items and documents related to their trade; and

s. based on my training, experience and participation in this and other drug trafficking investigations, I know that drug/firearm traffickers often possess, maintain and control other items related to their drug trafficking activities, as described in Attachment A to this affidavit, in their cars, homes, garages and out-buildings.

60. The firearms obtained by the CHS in this investigation were all preliminarily evaluated by the ATF. The ATF's preliminary conclusions are that six of the seven firearms traveled in interstate or foreign commerce before being sold to the CHS. The interstate history of the remaining firearm, a "ghost gun," could not be determined.

61. Over the course of NCGTF's investigation, MARRERO has sent approximately 10 photos and/or videos of firearms, all believed to be illegal trafficked and some of which were sold to the CHS, as described above, from **Target Telephone-2** to the CHS. Based on my training and experience, as a flip phone, **Target Telephone-1** is likely used by MARRERO to make drug sales, but he also appears to use **Target Telephone-2** frequently, as detailed above and including utilizing the photo/video features, to facilitate gun and drug sales.

## IV. CONCLUSION

62. On the basis of the foregoing information, there is probable cause to believe that beginning in or about October 2022 and continuing to late November 2022, MARRERO committed violations of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. §§ 922(a)(1)(A) that MOLINA-MENDEZ committed violations of 18 U.S.C. §§ 922(a)(1)(A) and 2.

63. There is also probable cause to believe that fruits, instrumentalities and evidence (described in further detail in Attachments B of the below listed Attachments A) of these crimes will be found at:

a. 303 High Street, 3rd Floor, North ("3N"), New Britain, Connecticut ("Target Premises 1") which is a third floor apartment of a three story residential structure located on the east side of High Street between Broad Street and Carmody Street, described in further detail in Attachment A-1.

b. 303 High Street, 1st Floor, South ("1S"), New Britain, Connecticut ("Target Premises 2") which is a first floor apartment of a three story residential structure located on the east side of High Street between Broad Street and Carmody Street,

described in further detail in Attachment A-2.

c. 303 High Street, basement, New Britain, Connecticut ("Target Premises 3") which is the basement of a three story resident structure located on the east side of High Street between Broad Street and Carmody Street. This is the basement of the residence which MARRERO told the CHS he has firearms hidden in the walls behind sheetrock, described in further detail in Attachment A-3.

d. The Target Telephones, described in further detail in Attachment A-4.

e. A blue Toyota Camry with license plate CT BH56240 ("Target Vehicle"), described in further detail in Attachment A-5.

64. Law enforcement plans to conduct the arrests and seizures in this case beginning in the late afternoon on or about December 1, 2022. Because of the large number of firearms to which the targets of this investigation have access, I submit that there is good cause to allow for these searches and arrests to occur at any time, day or night, so as to give maximum flexibility to law enforcement while planning these operations.

65. Because this is an application that pertains to an ongoing criminal investigation, and because disclosure of the information contained herein as well as disclosure of the warrants and complaints being requested herein may compromise the investigation and increase the risk of harm for the law enforcement officers responsible for conducting the arrests and searches, I request that the warrants, applications, complaints and this affidavit be ordered sealed by the Court, until further order of the Court.

Digitally signed by Christopher Kiely
Date: 2022.11.30 13:19:36 -05'00'

Chris Kiely
Task Force Officer
Federal Bureau of Investigation

Subscribed and Sworn to before me via telephonic attestation
this 30th day of November, 2022.

Date: 2022.11.30
15:27:14 -05'00'

HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

## DESCRIPTION OF PROPERTY TO BE SEARCHED (TARGET PREMISES 1)

303 High Street, 3rd Floor, North ("3N"), New Britain, Connecticut ("**Target Premises 1**") which is a third floor apartment on the north side of a three story residential structure located on the east side of High Street between Broad Street and Carmody Street. In the photo below, Target Premises 1 is in the top left corner of the building, as viewed from the street.



## ATTACHMENT B-1

## DESCRIPTION OF ITEMS TO BE SEIZED FROM TARGET PREMISES 1

With regard to the TARGET PREMISES 1 described in Attachment A-1, all information that constitutes fruits, evidence and/or instrumentalities of John MARRERO, a.k.a. "JJ" ("MARRERO") committing violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute, and distribution of, a controlled substance) and/or 18 U.S.C. § 922(a)(1)(A) (illegal dealing in firearms), including:

a. United States currency, money orders and other financial instruments;

b. books, records, receipts, notes, ledgers, and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances/firearms, including those stored in cellular telephones or electronic organizers and their electronically stored contents;

c. proceeds of drug/firearm sales and records of drug/firearm transactions; precious metals, jewelry and other items of value that may constitute proceeds of drug/firearm transactions; the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking activities;

d. contraband, quantities of narcotics, scales, cutting agents and diluents and drug packaging materials;

e. addresses or telephone numbers in books, papers, cellular telephones or electronic organizers, and their electronically stored contents, which reflect names, addresses, telephone numbers of and text messages to or from their associates and/or clients in narcotic/firearm trafficking activity; photographs and videotapes of participants and associates in narcotic/firearm trafficking activity and property acquired as a consequence of narcotics/firearm trafficking activities;

f. firearms, firearms containers, firearms locks, firearms parts, ammunition components, ammunition and other weapons;

g. safes and other secure storage containers and their contents; and

h. identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers.

**ATTACHMENT A-2**

**DESCRIPTION OF PROPERTY TO BE SEARCHED (TARGET PREMISES 2)**

303 High Street, 1st Floor, South ("1S"), New Britain, Connecticut ("**Target Premises 2**") which is a first floor apartment on the south side of a three story residential structure located on the east side of High Street between Broad Street and Carmody Street. In the photo below, Target Premises 2 is in the bottom right corner of the building, as viewed from the street



**ATTACHMENT B-2**

**DESCRIPTION OF ITEMS TO BE SEIZED FROM TARGET PREMISES 2**

With regard to the TARGET PREMISES 2 described in Attachment A-2, all information that constitutes fruits, evidence and/or instrumentalities of John MARRERO, a.k.a. "JJ" ("MARRERO") committing violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute, and distribution of, a controlled substance) and/or 18 U.S.C. § 922(a)(1)(A) (illegal dealing in firearms), including:

a. United States currency, money orders and other financial instruments;

b. books, records, receipts, notes, ledgers, and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances/firearms, including those stored in cellular telephones or electronic organizers and their electronically stored contents;

c. proceeds of drug/firearm sales and records of drug/firearm transactions; precious metals, jewelry and other items of value that may constitute proceeds of drug/firearm transactions; the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking activities;

d. contraband, quantities of narcotics, scales, cutting agents and diluents and drug packaging materials;

e. addresses or telephone numbers in books, papers, cellular telephones or electronic organizers, and their electronically stored contents, which reflect names, addresses, telephone numbers of and text messages to or from their associates and/or clients in narcotic/firearm trafficking activity; photographs and videotapes of participants and associates in narcotic/firearm trafficking activity and property acquired as a consequence of narcotics/firearm trafficking activities;

f. firearms, firearms containers, firearms locks, firearms parts, ammunition components, ammunition and other weapons;

g. safes and other secure storage containers and their contents; and

h. identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers.

## ATTACHMENT A-3

## DESCRIPTION OF PROPERTY TO BE SEARCHED (TARGET PREMISES 3)

The basement of 303 High Street, New Britain, Connecticut ("**Target Premises 3**"), which is a three story residential structure located on the east side of High Street between Broad Street and Carmody Street New Britain, Connecticut. In the photo below, Target Premises 3 would include the floor immediately below the visible bottom floor of windows.



## ATTACHMENT B-3

## DESCRIPTION OF ITEMS TO BE SEIZED FROM TARGET PREMISES 3

With regard to the TARGET PREMISES 3 described in Attachment A-3, all information that constitutes fruits, evidence and/or instrumentalities of John MARRERO, a.k.a. "JJ" ("MARRERO") committing violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute, and distribution of, a controlled substance) and/or 18 U.S.C. § 922(a)(1)(A) (illegal dealing in firearms), including:

a. United States currency, money orders and other financial instruments;

b. books, records, receipts, notes, ledgers, and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances/firearms, including those stored in cellular telephones or electronic organizers and their electronically stored contents;

c. proceeds of drug/firearm sales and records of drug/firearm transactions; precious metals, jewelry and other items of value that may constitute proceeds of drug/firearm transactions; the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking activities;

d. contraband, quantities of narcotics, scales, cutting agents and diluents and drug packaging materials;

e. addresses or telephone numbers in books, papers, cellular telephones or electronic organizers, and their electronically stored contents, which reflect names, addresses, telephone numbers of and text messages to or from their associates and/or clients in narcotic/firearm trafficking activity; photographs and videotapes of participants and associates in narcotic/firearm trafficking activity and property acquired as a consequence of narcotics/firearm trafficking activities;

f. firearms, firearms containers, firearms locks, firearms parts, ammunition components, ammunition and other weapons;

g. safes and other secure storage containers and their contents; and

h. identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers.

## ATTACHMENT A-4

## DESCRIPTION OF PROPERTY TO BE SEARCHED (TARGET TELEPHONES)

A flip phone which is serviced by T-Mobile and assigned phone number (959) 212-9684 ("**Target Telephone-1**"), and a smart phone which is serviced by T-Mobile and assigned phone number (959) 225-1068 ("**Target Telephone-2**") (collectively, the "**Target Telephones**").

It is specifically authorized that stored electronic information, and images contained in the above described devices may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copy said stored electronic information into storage in another device

## ATTACHMENT B-4

## DESCRIPTION OF ITEMS TO BE SEIZED FROM TARGET TELEPHONES

With regard to the Target Telephones described in Attachment A-4, all information that constitutes fruits, evidence and/or instrumentalities of John MARRERO, a.k.a. "JJ" ("MARRERO") committing violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute, and distribution of, a controlled substance) and/or 18 U.S.C. § 922(a)(1)(A) (illegal dealing in firearms), and all information that constitutes fruits, evidence and/or instrumentalities of Liamdel MOLINA-MENDEZ, a.k.a. "Leo" ("MOLINA-MENDEZ") committing violations of 18 U.S.C. § 922(a)(1)(A) (illegal dealing in firearms) and § 2, including:

a. the telephone number, ESN number, serial number, and SIM card number of said device;

b. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

c. lists of customers, sources and/or co-conspirators, and related identifying information, such as photographs and entries regarding their phone numbers, nicknames, addresses, and locations;

d. types, amounts and prices of drugs/firearms involved in transactions, as well as dates, places, photos and amounts of specific transactions and/or attempted transactions;

e. communications, including call log activities, instant messaging activities and/or or text messages, exchanged in the furtherance of or related to drug/firearm trafficking activity;

f. information regarding MARRERO and/or his associates' (including MOLINA-MENDEZ) schedules or travel;

g. bank records, checks, credit card bills, account information and other financial records relating to MARRERO's unexplained wealth and drugs/firearm trafficking activities;

h. photographs, images, video recordings and other formats utilized to capture, save, send, possess, or receive digital images relating to drug/firearm trafficking activity and/or anything that may constitute evidence of the offenses listed above for MARRERO and MOLINA-MENDEZ;

i. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the offenses

listed above for each individual;

j. any and all records, however created or stored, which tend to demonstrate ownership and use of the device, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the device;

k. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the device, such as passwords, sign-on codes, and program design;

l. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

m. saved searches, locations, and route history in the memory of said devices;

n. internet browsing history, to include, internet searches in the memory of said device;

o. images and videos in the memory of said device; and

p. Evidence of user attribution showing who used or owned the **Target Telephones** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described devices may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

To the extent that the **Target Telephones** contain removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

**ATTACHMENT A-5**

**DESCRIPTION OF PROPERTY TO BE SEARCHED (TARGET VEHICLE)**

A blue Toyota Camry with license plate CT BH56240, registered to an individual with initials J.R., hereinafter the "TARGET VEHICLE."

## ATTACHMENT B-5

## DESCRIPTION OF ITEMS TO BE SEIZED FROM TARGET VEHICLE

With regard to the TARGET VEHICLE described in Attachment A-5, all information that constitutes fruits, evidence and/or instrumentalities of John MARRERO, a.k.a. "JJ" ("MARRERO") committing violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute, and distribution of, a controlled substance) and/or 18 U.S.C. § 922(a)(1)(A) (illegal dealing in firearms), including:

a. United States currency, money orders and other financial instruments;

b. books, records, receipts, notes, ledgers, and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances/firearms, including those stored in cellular telephones or electronic organizers and their electronically stored contents;

c. proceeds of drug/firearm sales and records of drug/firearm transactions; precious metals, jewelry and other items of value that may constitute proceeds of drug/firearm transactions; the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking activities;

d. contraband, quantities of narcotics, scales, cutting agents and diluents and drug packaging materials;

e. addresses or telephone numbers in books, papers, cellular telephones or electronic organizers, and their electronically stored contents, which reflect names, addresses, telephone numbers of and text messages to or from their associates and/or clients in narcotic/firearm trafficking activity; photographs and videotapes of participants and associates in narcotic/firearm trafficking activity and property acquired as a consequence of narcotics/firearm trafficking activities;

f. firearms, firearms containers, firearms locks, firearms parts, ammunition components, ammunition and other weapons;

g. safes and other secure storage containers and their contents; and

h. identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers.